IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

July 9, 2024 Session

## DARIUS MARKEE ALSTON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lauderdale County
No. 9775    A. Blake Neill, Judge**

_____

**No. W2023-00783-CCA-R3-ECN**

_____

The Petitioner, Darius Markee Alston, appeals the Lauderdale County Circuit Court's denial of his untimely petition for writ of error coram nobis. Upon review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Jacob A. Vanzin, Nashville, Tennessee, for the appellant, Darius Markee Alston.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner and his co-defendant were convicted by a Lauderdale County jury of two counts of first-degree murder, two counts of first-degree felony murder, two counts of especially aggravated robbery, and unlawful possession of a firearm by a felon, for which the Petitioner received an effective sentence of life in confinement. State v. Alston, No. W2018-00550-CCA-R3-CD, 2020 WL 1972334, at *1 (Tenn. Crim. App. Apr. 24, 2020). This court affirmed his convictions on direct appeal.

The proof presented at trial established that the Petitioner and his co-defendant killed the victims, Eric Washington and Jonathan Jones, via multiple gunshot wounds from a 12-gauge shotgun during a robbery at a local cemetery. Id.

Nicole Pettigrew, Washington's girlfriend, testified that earlier on the day of the murders, the Petitioner and his co-defendant had attended a dice game at her home during which Washington displayed $6,000 or $7,000 in cash that he was currently carrying. Id. at *2. Later that afternoon, Washington left with Jones to go to Auto Zone to procure parts needed to repair Pettigrew's car.

On the way, the victims encountered Sammy Haley, Washington's father, at a Midway Market. Haley left the gas station to attend a family barbecue nearby and saw the Petitioner walking by the road about two hundred yards from the gas station. At the barbecue less than an hour later, Haley received a phone call informing him that something had happened to Washington near the cemetery. Haley stated the Petitioner did not arrive at the barbecue until after the murders.

Josephine Haley, Washington's mother and Jones' cousin, testified that she attended the barbecue with the Petitioner's girlfriend, Veronica Washington, who repeatedly asked Josephine to drive her to Midway Market to purchase cigarettes for the Petitioner.[1] Id. The Petitioner's girlfriend told Josephine that the Petitioner was at "Michelle's" home. While on the way to the gas station, the two saw an ambulance driving towards the cemetery, and they bought the cigarettes and delivered them to the Petitioner. At "Michelle's" home, Josephine made several unanswered calls to Washington before receiving a call from her other son who informed her that the victims had been in a car accident by the cemetery.

Josephine discovered at the scene that Washington and Jones had died. The Petitioner, who had accompanied her, hugged her and told her that "Goon[,]" Josephine's cousin, killed Washington and that he (the Petitioner) would have killed Goon if he (the Petitioner) had a gun. Josephine stated at the trial that she did not believe Goon killed the victims. Josephine returned to the barbecue, and the Petitioner arrived wearing a bulletproof vest. Josephine stated this was the Petitioner's first time arriving at the barbecue. At trial, she also shared her belief that the Petitioner's girlfriend's eagerness to buy cigarettes was "strange" and seemed to be designed to rush her to Michelle's home to establish an alibi for the Petitioner. Id.

Ola Faye Jones, Jones' mother, testified that when she was at the cemetery in the wake of the murders, she saw the Petitioner remove his white shirt and toss it into a ditch as he was leaving, which she collected and gave to investigators the next day. Id.

Tennessee Bureau of Investigation Special Agent Mark Reynolds investigated the crime scene and noted that the pockets of Washington's pants were turned inside out as if

---

[1] Because Josephine Haley and Sammy Haley share a surname, we will refer to Josephine by her first name. We intend no disrespect in doing so.

someone had gone through them.  Id. at *3.  Washington's pants, the Petitioner's t-shirt, a baseball cap found on the driver's side floor, and the recovered shotgun shells underwent forensic analysis, but the results were inconclusive.

Agent Reynolds interviewed the Petitioner, who claimed to have been at a barbecue during the murders. Investigator Reynolds noted that the Petitioner was "very nervous" during the interview and spoke in a way "indicative of someone trying to think of something to say or give a correct answer." Id. Investigator Reynolds also shared that the Petitioner's girlfriend was present during the interview and seemed to have an expression that disagreed with what the Petitioner was saying. Investigator Reynolds had reviewed surveillance footage from the day of the murders showing Washington speaking to Haley at the gas station while the co-defendant walked out of the gas station wearing a baseball cap later recovered from the crime scene. Investigator Reynolds also testified that he interviewed Haley, and that Haley's statement contradicted the Petitioner's alibi, which was supported by the surveillance footage.

Terence Scales testified that he had been incarcerated with the Petitioner and co-defendant, and that the co-defendant had confessed to participation in a double homicide with an accomplice at a cemetery. The co-defendant had shared that the victims had been lured to the cemetery for a drug transaction, and that he and his accomplice "took what they wanted to take[.]" Id. Scales also testified that the Petitioner was present during one of these conversations and expressed disgruntlement towards Jones for having switched gang affiliation.

Terrance Yarbrough also testified that after the Petitioner's mother died from cancer, the Petitioner told Yarbrough that he believed his mother had died because of karma. The Petitioner also told Yarbrough that he and an accomplice had set up the Petitioner's cousin, Washington.  The Petitioner explained to Yarbrough that he rode to the cemetery in the car with the victims for a Vice Lords' meeting, and the Petitioner and co-defendant robbed and killed the victims once at the cemetery.

Marwan Muex, another one of the co-defendant's cellmates, testified that the co-defendant shared that he and his "partner" had lured the victims to the cemetery under the pretense of a Vice Lord's meeting. Id. at *4. The cellmates were later recalled during the State's rebuttal, reiterated their earlier testimony, and added that the co-defendant implicated the Petitioner during the conversations as well. Id. at *5.

Agent Reynolds testified again during the State's rebuttal and stated that the co-defendant claimed that the Petitioner admitted to several people that he had shot the victims with a 12-gauge shotgun at the cemetery, which was information consistent with the

shotgun shell recovered at the crime scene and not yet released to the public. Id. at *4. The Petitioner and co-defendant were convicted.

The Petitioner subsequently filed a petition for post-conviction relief based on numerous grounds. As relevant to the instant petition for writ of error coram nobis, the Petitioner argued he received ineffective assistance of counsel due to trial counsel's failure to obtain a competency evaluation and to investigate and present alibi witnesses. Alston v. State, No. W2022-00099-CCA-R3-PC, 2023 WL 3454647, at *5 (Tenn. Crim. App. May 15, 2023), perm. app. denied (Tenn. Oct. 13, 2023). At the post-conviction hearing, trial counsel testified that he first met the Petitioner at a facility in North Carolina where the Petitioner was undergoing a forensic evaluation to determine whether he was competent to stand trial in federal court for pending drug-related charges related to the Vice Lords. Id. at *7. Trial counsel stated that the Petitioner was deemed competent to stand trial, and that the medication regime established when the Petitioner was in federal custody appeared to help him. Trial counsel explained that the Petitioner communicated well and understood their discussions. Trial counsel also testified that the Petitioner could not establish an alibi for the time of the shooting. Id. at *8. Counsel recalled that the Petitioner had been at a family barbecue, but the gathering had not coincided with the time of the murders and that the bodies and car were at the cemetery an indeterminate amount of time before the police had been called.

During the pendency of his post-conviction appeal, the Petitioner requested this court hold his appeal in abeyance pending the outcome of the instant petition, which this court denied. Id. at *13. In affirming the denial of post-conviction relief, this court observed that little evidence was offered regarding the Petitioner's mental health aside from a trial court order for a mental evaluation in the record. No evidence was presented at the evidentiary hearing nor was trial counsel questioned about the order. This court also observed that trial counsel was not questioned regarding his efforts to investigate a potential alibi, the Petitioner did not present any potential alibi witnesses at the hearing, and Haley's statement at trial, corroborated by video surveillance footage, contradicted the Petitioner's alibi. Id. Following this court's denial of post-conviction relief, the Petitioner filed a pro se notice of appeal in his post-conviction proceeding on August 3, 2021, and a pro se motion for waiver of timely notice of appeal on January 5, 2022.

On September 15, 2022, the Petitioner filed the instant petition for writ of error coram nobis, claiming that he offered newly discovered evidence in the form of two affidavits from his aunt and uncle, Michelle and Marvin Johnson, that he was with them during the time the murders occurred. The Petitioner contends that the alibi testimonies from the Johnsons qualified as newly discovered evidence "not yet ascertained" because although they were physically available to testify at the Petitioner's trial, they were not "constitutionally" available because the Petitioner received ineffective assistance of

- 4 -

counsel when trial counsel did not call the Johnsons to the stand and because the Petitioner was inhibited from participating fully in his defense due to his mental illness.

The affidavit of Michelle Johnson provided that she is the aunt of the Petitioner, whom they call "Jack," and second cousin to Washington. The night before the murders, Michelle and her husband, Marvin, were eating dinner at Red Lobster where she received a phone call from her brother.[2] Her brother informed her that the Petitioner "had gotten into a fight" with someone named Jamelle Buck, whose nickname is "Goons." At the behest of her brother, Michelle traveled back to Hennings with Marvin to pick the Petitioner up near a place they referred to as the "Big House" and took him to their home on Latham Street. The Petitioner remained at their home overnight, and Michelle and Marvin took turns staying awake to watch him throughout the night. The Petitioner was still at home in the morning when they woke him up.

The Johnsons hosted a family barbecue at their home that day, Josephine was there, and received a phone call that something had happened to her son. Josephine told the Johnsons she had to leave. Fifteen to twenty minutes later, the Johnsons received a call that the victims had been shot. Partygoers left to go to the crime scene while Michelle remained at her home with her grandchildren. She claimed the Petitioner remained at her home the entire day up until that point.

When Michelle learned in the newspaper that the Petitioner was charged with the murders, she was upset. The Petitioner called and informed her that an attorney would be calling her as well, but none did. She attempted to contact the Public Defender's office multiple times and left messages. When the Petitioner's attorney eventually returned her message, he told her that he would call to get more information, but never did. During the Petitioner's trial, Michelle went to the courthouse and told his attorney that she was there and available to testify if needed. She remained present for the two-day trial but was never called to testify. After the Petitioner's conviction, Michelle heard that the Petitioner's mother hired a new attorney for him, but the new attorney also did not contact Michelle. She traveled again to the courthouse on another court day for the Petitioner but was not allowed inside due to COVID protocols. Michelle stated the Petitioner's current counsel is the only attorney that had contacted her.

Marvin Johnson's affidavit provided the same facts surrounding picking up the Petitioner and taking him to their home the night before the murders. According to Marvin, the Petitioner went to sleep in one of his stepdaughter's rooms while he and Michelle stayed

---

[2] Because Michelle Johnson and Marvin Johnson share a surname, we will refer to each by their first names. We intend no disrespect in doing so.

up late talking and watching television. Marvin was in the backyard with Josephine and several others grilling when she received the phone call about the victims.

An evidentiary hearing was held on January 13, 2023, and Michelle testified consistently with her testimony from her affidavit. On the day of the murders, the Petitioner did not wake until his girlfriend arrived at the home with Josephine. The Johnsons had begun grilling for the barbecue between 12:00 p.m. and 2:00 p.m., and the Petitioner had been at home up until that point. Michelle did not recall him leaving the home prior to the discovery of the victims. The Petitioner did not have his own car, and no one arrived at the home that day to take him anywhere. Because the Petitioner was sleeping on the couch in the open living room of the home, Michelle could see him "at all times[]" while she was in the kitchen. Michelle stated that the cemetery the victims were discovered at was about a ten-minute drive from her home. It would have taken at least twenty minutes to travel to the cemetery and back, and the Petitioner never left her sight until the discovery of the victims. The Petitioner left Michelle's home after the victims were found. While at Michelle's home, the Petitioner did not change clothes, nor did he have any blood on his clothing.

On cross-examination, Michelle confirmed that people were inside and outside of the home as they fixed their food at the barbecue, and the Petitioner was asleep on the couch throughout. She explained that her home was a mile and a half to two miles away from Midway Market. She acknowledged that Haley's testimony seeing the Petitioner at Midway Market that day contradicted her own testimony.

Marvin Johnson testified consistently with the facts in his affidavit. When asked if the Petitioner had been asleep on the couch in the morning or early afternoon on the day of the murders, Marvin answered that the Petitioner had been asleep in one of the bedrooms. The Petitioner had been at the home when Josephine arrived alongside his girlfriend, and the Petitioner was outside at the grill with Marvin when Josephine received the phone call about the victim. Marvin asserted that the Petitioner had been at home all day. On cross-examination, he acknowledged that the Petitioner could have left through the window of the bedroom if he wanted the night prior, and that neither he nor Michelle watched the Petitioner throughout the night.

Jacqueline Alston, the Petitioner's cousin, testified that she found out about the murders during the barbecue at Michelle's home when the call first came. The Petitioner was at home sitting awake in the living room when Jacqueline arrived close to 12:00 p.m. He was there when Josephine and his girlfriend arrived to bring him cigarettes, and he was there when Josephine received the call about the victims. Josephine was at the home for approximately ten to fifteen minutes before receiving the phone call, and Jacqueline knew the Petitioner did not leave during this time because she had sat in the kitchen with a view

of the living room where the Petitioner was and would have noticed if he had left.  On cross-examination, she insisted that she never saw the Petitioner go outside during the barbecue.

Defense counsel entered into evidence certified records regarding the Petitioner's mental health, a motion for continuance from the Petitioner's trial counsel, and an order for forensic evaluation from the trial court.  The medical reports show that the Petitioner was first diagnosed with schizophrenia on March 22, 2018, and was prescribed the antipsychotic medication Haldol.  During the relevant statute of limitations period, January 14, 2019, to January 14, 2020, the Petitioner's medical records showed that he exhibited "psychotic thinking" and sent out "unreadable" notes.  Reports from May through November 2019, provided that the Petitioner appeared "stable."  From April 2020, to May 2022, the Petitioner's psychiatric records consistently indicated that he appeared "calm and stable," except several periodic reports that the Petitioner demonstrated "loose assoc[iation][,]" "flight of ideas[,]" and "expansive thought processes[.]"  On November 1, 2021, the Petitioner was placed on suicide watch after demonstrating suicidal ideation and declaring he heard male and female voices telling him "do what you have to do."

Sammy Haley testified consistently with his trial testimony and clarified that the barbecue he had attended was not the one at Michelle Johnson's home.  Although his trial testimony provided that it had been around 3:30 or 4:00 p.m. when he was at Midway Market with the victims, he was unsure of the exact time because he had been drinking and partying.  He was riding in the backseat of a car driven by his brother-in-law when he saw the Petitioner walking down the road near the Midway Market approximately twenty-five yards away.  Sammy explained that the car was going less than twenty-five miles per hour because of pot holes in the road, and that he knew it was the Petitioner because "[t]hat's [his] cousin . . . ."

Josephine Haley testified consistently with her testimony from trial.

The Petitioner's previous trial counsel testified consistently with his testimony from the post-conviction hearing regarding the state of the Petitioner's mental health and potential alibi defenses.  Regarding the January 13, 2017 order directing forensic evaluation entered into evidence at the instant hearing, trial counsel stated that an evaluation was never done because the records from federal court, conversations with the Petitioner's federal counsel, and conversations with the Petitioner himself did not show any evidence to his trial counsel of anything "that would amount to an insanity defense."  Trial counsel testified that during preparation for the trial, the Petitioner told him that the evening before the murders, he had been at a club where he met a woman that could serve as an alibi witness. The Petitioner went home at 1:00 or 2:00 a.m., then went to a family barbecue later that day.  On cross-examination, trial counsel agreed that he had never

specified where the Petitioner meant when he said "home," that he assumed by the wording that the Petitioner "got up and then . . . went over [to the barbecue][]," and that they were two different locations.

Regarding the January 8, 2015 motion for continuance, trial counsel agreed that he had requested a continuance due to the Petitioner being in federal custody while being treated for "severe mental illness" pending the determination of his competency for trial. Trial counsel acknowledged the order for forensic evaluation was not completed and that the Petitioner had been deemed competent to stand trial in his federal case.

On February 17, 2023, the Petitioner filed a post-trial brief arguing that his mental incompetency and ineffective assistance of counsel entitled him to equitable tolling of the statute of limitations. The State responded that the Petitioner had not shown that he was of unsound mind during the year after his judgment became final, the Petitioner was of sound enough mind to hire private counsel to represent him on his appeal and post-conviction petition, and that the Petitioner was simply attempting to gain another post-conviction hearing on his already decided ineffective assistance of counsel claim.

On March 27, 2023, the order denying coram nobis relief was filed. The coram nobis court observed that the only proof offered by the Petitioner regarding the state of his mental health were medical records. The medical records reflected that the Petitioner was diagnosed with schizophrenia on March 22, 2018, and prescribed the antipsychotic medication Haldol. On November 15, 2019, the Petitioner demonstrated "psychotic thinking" and the "things he told nurses and [correctional officers] made no sense[.]" On December 5, 2019, the Petitioner's records stated he sent "unreadable/indecipherable" notes "all the time[,]" and on March 19, 2020, the Petitioner was pulling his hair out "by the handful" and displayed behavior similar to those with schizophrenia. In April 2020, the Petitioner attempted to commit suicide by swallowing a razor.

The coram nobis court noted that from April 29, 2020, to May 12, 2022, the Petitioner's psychiatric records indicated that he appeared "calm and stable," was compliant with his medication, and was "functioning without difficulty[.]" The coram nobis court stated that the Petitioner's psychiatric records indicated a period of stability from May 30, 2019, to February 5, 2020. Applying Reid ex rel. Martiniano v. State, 396 S.W.3d 478, 512 (Tenn. 2013), the coram nobis court concluded that the Petitioner's mental health was not severe enough to toll the statute of limitations. The court further noted the relevant time period as January 14, 2019, the date the statute of limitations began to run, to September 15, 2022, the date the Petitioner filed his petition, and reasoned:

> Applying the three-step test from Reid, the Court finds as follows: (1) The
> Petitioner is suffering from a mental disease or defect—Petitioner's medical

records show Petitioner has been diagnosed with schizophrenia and is taking antipsychotic medication. (2) The Petitioner's mental disease or defect does not prevent him from understanding his legal position and the options available to him—the evidence shows that Petitioner filed a pro se motion to appeal the denial of his post-conviction on August 3, 2021, and a pro se motion for waiver of timely notice of appeal on January 5, 2022. These pro se motions show that Petitioner understood his legal position and the options available to him on August 3, 2021, which is in line with his psychiatric medical records showing that from approximately April 2020 through May 2022, Petitioner was calm and stable, compliant with his medications, and functioning without difficulty. (3) Petitioner's mental disease or defect did not prevent Petitioner from making a rational choice among his options. Again, Petitioner was able to file a pro se notice of appeal on August 3, 2021, yet did not file this Petition for writ of error coram nobis until September 15, 2022. And while Petitioner may have been ignorant about his ability to file a writ to raise his alibi defense, this ignorance does not toll the statute of limitations. And Petitioner has failed to put forth any evidence to show that from August 3, 2021, through August 3, 2022, his mental disease or defect prevented him from making a rational choice as to whether to seek a writ of error coram nobis. In fact, the medical proof Petitioner cites in his post-trial brief does not include any reference to his mental condition after May 2, 2021. So Petitioner has failed to present clear and convincing evidence of his mental incompetence to justify the tolling of the statute of limitations until September 15, 2022. (internal citations omitted).

The coram nobis court also found that the Petitioner was not abandoned by trial or post-conviction counsel and that the Petitioner was capable of filing a pro se writ of error coram nobis as evidenced by his August 3, 2021 pro se post-conviction notice of appeal. The Petitioner did not put forth any evidence that his trial or post-conviction counsel mislead him in any way regarding their continued representation of him nor the statute of limitations for a writ of error coram nobis. The Petitioner filed a late-notice of appeal on May 27, 2023, and trial counsel stated in the attached motion that he never received notice from the Lauderdale County Circuit Court clerk's office of the error nobis court's order denying the petition. This court waived the timely filing of the Petitioner's notice of appeal, and this case is now properly before us for review.

## ANALYSIS

The Petitioner argues that his mental illness entitles him to equitable tolling of the statute of limitations because it was so severe that he "could not possibly understand his legal position nor make a rational choice amongst the legal options available to him." He

also argues that he is entitled to equitable tolling because his attorneys' conduct "effectively constituted client abandonment." The State responds that the Petitioner's mental illness did not preclude him from filing a petition during the statute of limitations. The State also argues that the Petitioner's prior counsel did not abandon the Petitioner and tolling was not warranted because the Petitioner's alibi witnesses were known to him at the time of trial and did not present new evidence of actual innocence. We agree with the State.

A writ of error coram nobis is available to convicted defendants. Tenn. Code Ann. § 40-26-105(a). However, a writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citing Penn v. State, 670 S.W.2d 426, 428 (Ark. 1984)). "The purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting State ex rel. Carlson v. State, 407 S.W.2d 165, 167 (Tenn. 1966)). Relief by petition for writ of error coram nobis is provided for in Tennessee Code Annotated section 40-26-105. The statute provides, in pertinent part:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.
>
> (c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause. . . .

Tenn. Code Ann. § 40-26-105(b), (c).

The decision to deny a petition for writ of error coram nobis on the grounds of subsequently or newly discovered evidence rests within the sound discretion of trial court, which this court will not disturb absent an abuse of discretion. Tenn. Code Ann. § 40-26-105. In order to qualify as "newly discovered evidence" for the purposes of a writ of error coram nobis, the proffered evidence must be (1) evidence of facts existing, but not yet ascertained, at the time of the original trial, (2) admissible, and (3) credible. Nunley v.

State, 552 S.W.3d 800 (Tenn. 2018). A motion seeking a new trial based on newly discovered evidence "must also be supported by affidavits." Harris v. State, 301 S.W.3d 141, 152 (Tenn. 2010) (Koch and Clark, JJ., concurring).

A petition for a writ of error coram nobis must be filed within one year after the challenged judgment becomes final. Tenn. Code Ann. § 27-7-103. The petition is subject to being summarily dismissed if it does not show on its face that it has complied with the one-year statute of limitations, and such compliance is an essential element of a coram nobis claim. Nunley, 552 S.W.3d at 828 (quoting Harris, 301 S.W.3d at 153 (Koch and Clark, JJ., concurring)). "To accommodate due process concerns, the one-year statute of limitations may be tolled if a petition for a writ of error coram nobis seeks relief based upon new evidence of actual innocence discovered after expiration of the limitations period." Id. at 828-29.

If the coram nobis petition does not show on its face that it has been filed within the one-year statute of limitations, the petition must set forth with particularity facts demonstrating that the prisoner is entitled to equitable tolling of the statute of limitations:

> To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims. . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.

Id. at 829.

As the Tennessee Supreme Court has recently stated, "new evidence of actual innocence" must be "clear and convincing." Clardy v. State, 691 S.W.3d 390, 407-408 (Tenn. 2024). The Court explained the clear and convincing standard as:

> To meet the clear and convincing standard, the trial court must determine that the evidence offered . . . is not vague and uncertain. The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

- 11 -

Id. at 408 (quoting State v. Jones, 450 S.W.3d 866, 893 (Tenn. 2014)).  Thus, new evidence of actual innocence, if credited, should leave the trial court with no "serious or substantial doubt that the petitioner is actually innocent."  Id.

"Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness."  Nunley, 552 S.W.3d at 830 (quoting Harris, 301 S.W.3d at 145) (internal quotation marks omitted).  Upon review of a petition for a writ of error coram nobis for timeliness, an appellate court must first determine whether the petitioner "asserted the claim in a timely manner and, if not, whether he has demonstrated that he is entitled to equitable tolling of the statute of limitations as provided in Tennessee Code Annotated Section 27-7-103. . . ."  Id. at 831 (quoting Harris, 301 S.W.3d at 155 (Koch and Clark, JJ., concurring)) (internal quotation marks omitted).  Upon the discovery of new evidence, the petition must show that the petitioner filed his writ of error coram nobis no more than one year after the discovery.  Clardy, 691 S.W.3d at 408.  The inquiry ends if his petition is not timely and if the petitioner has failed to demonstrate that he is entitled to relief from the statute of limitations."  Id. at 409.

The original judgments are not included in the appellate record, and the error coram nobis court's order denying the petition notes that the judgments became final and the statute of limitations began to run January 14, 2019, thirty days after the Petitioner's motion for new trial was denied.  The statute of limitations expired January 14, 2020, and the Petitioner did not file his petition until September 15, 2022, over two years after the expiration of the statute of limitations.  Accordingly, the petition is time-barred unless the Petitioner demonstrates he is entitled to equitable tolling of the statute of limitations.  To establish equitable tolling, the Petitioner argues that his mental illness and ineffective assistance of counsel prevented him from sooner filing his petition.  The Petitioner claims that the record supports that he was mentally incompetent and unable to understand his legal options or make rational decisions.  Additionally, the Petitioner argues that "attorney abandonment" warrants tolling of the statute of limitations because he was unable to present the alibi statements of the Johnsons at trial or post-conviction.  Though the Petitioner requests we adopt the Reid standard for determining the level of mental incompetence a petitioner must show before being entitled to due process tolling in post-conviction proceeding to a petition for writ of error coram nobis, we decline to do so on the facts of this case.  The Reid test has not been previously applied to a coram nobis proceeding, and we will not do so now.

The Petitioner argues that he was incapable of filing a petition for writ of error coram nobis before the statute of limitations had run due to mental incompetency.  The Petitioner was first diagnosed with schizophrenia on March 22, 2018, and was prescribed the antipsychotic medication Haldol.  During the relevant statute of limitations period from

- 12 -

January 14, 2019, to January 14, 2020, the Petitioner's medical records show that he exhibited "psychotic thinking" and sent "unreadable" notes to his doctors. However, reports from May through November 2019 show that the Petitioner appeared "stable." From April 2020, to May 2022, the Petitioner's psychiatric records consistently indicated that he appeared "calm and stable," except for several periodic reports that the Petitioner demonstrated "loose assoc[iation][,]" "flight of ideas[,]" and "expansive thought processes[.]" On November 1, 2021, the Petitioner was placed on suicide watch after demonstrating suicidal ideation and declaring he heard male and female voices telling him "do what you have to do." Significantly, the Petitioner filed a pro se notice of appeal in his post-conviction proceeding on August 3, 2021, and a pro se motion for waiver of timely notice of appeal on January 5, 2022, prior to the instant September 15, 2022 petition.

We conclude that denial of the petition was proper because the Petitioner failed to establish that he was entitled to equitable tolling. The Petitioner alleges that he was unable to file his petition because he was mentally incompetent and unable to understand his legal options or make rational decisions. Trial counsel testified at the Petitioner's post-conviction hearing that the Petitioner had been deemed competent to stand trial in his federal case and that the medication regime established in federal custody appeared to help the Petitioner. Trial counsel also stated that the Petitioner communicated well and understood their discussions. The record also shows that the Petitioner filed both a pro se notice of appeal in his post-conviction proceeding on August 3, 2021, and a pro se motion for waiver of timely notice of appeal on January 5, 2022. These filings show that the Petitioner was mentally capable of making legal decisions on his own behalf, regardless of the Petitioner's claim that they were made with the aid of law clerks at the correctional facility.

The Petitioner also argues that "attorney abandonment" precluded him from presenting the alibi testimony of the Johnsons until now because trial counsel and post-conviction counsel failed to put forth diligent effort in locating alibi witnesses. Nothing in the record supports the Petitioner's claim that he was "abandoned" by trial or post-conviction counsel. Moreover, although the affidavits were obtained on September 7, 2022, the Johnsons were known to the Petitioner at the time of his 2018 trial and 2021 post-conviction hearing. Despite the Petitioner's reliance on alleged "attorney abandonment" as grounds for why he waited over two years to seek error coram nobis relief, such a claim is not an appropriate ground for coram nobis relief and does not justify tolling the statute of limitations. State v. Sutton, No. E2019-01062-CCA-R3-ECN, 2020 WL 703607, at *4 (Tenn. Crim. App. Feb. 11, 2020).

In addition, even if we considered the Johnsons' affidavits as later arising grounds for tolling purposes, they would not meet the "clear and convincing" evidentiary standard to prove actual innocence as dictated by Clardy. "As a general rule, subsequently or newly

discovered evidence which . . . serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial . . . will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced, would not have resulted in a different judgment." Hart, 911 S.W.2d at 375 (internal citations omitted). The Johnson' affidavits and testimonies at the coram nobis hearing contradict each other regarding the Petitioner's whereabouts in the home on the night before and the day of the murders. While Michelle testified that the Petitioner had spent the entire night and day on the couch in either her or her husband's sight, Marvin testified that the Petitioner had slept in a bedroom and was not watched by them during the night before. Sammy Haley's testimony at trial and at the coram nobis hearing further contradicts the Johnsons' affidavits by placing the Petitioner at the Midway Mart during the day prior to the discovery of the victims' deaths. Agent Reynolds also explained that the interview with Haley contradicted the Petitioner's alibi and was supported by the surveillance footage. Trial counsel testified at the Petitioner's post-conviction hearing that the Petitioner had been unable to establish an alibi. It is unlikely that the testimony of the Johnsons would have resulted in a different judgment at trial. Accordingly, denial of the Petitioner's petition was proper.

## CONCLUSION

Based upon the above reasoning and authority, we affirm the coram nobis court's denial of the petition.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE